IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JOSETO BLACK,**                                    Case No. 1:14 CV 713

      Plaintiff,

      v.                                              Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                             MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Joseto Black ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Following their briefing, the parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. *See* Docs. 26-27. Following review, and for the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff protectively filed for SSI in December 2010, alleging a disability onset date of September 20, 2010. (Tr. 56, 205-10). His claims were denied initially and upon reconsideration. (Tr. 102, 115). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 122). An ALJ held a hearing on October 15, 2012. *See* Tr. 73. On December 17, 2012, the ALJ found Plaintiff not disabled in a written decision. (Tr. 73-79). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner.

(Tr. 84-90); *see* 20 C.F.R. §§ 416.1455, 416.1481. Plaintiff timely filed the instant action on April 1, 2014. (Doc. 1).

In June 2014, the Commissioner moved to remand the case pursuant to sentence six of 42 U.S.C. § 405(g) due to an inaudible recording of the hearing. (Doc. 11). Plaintiff did not oppose the remand at a phone conference ((Non-document entry dated June 18, 2014). The district court granted the remand (Docs. 14-15); see also Tr. 91 (amended judgment entry ordering remand)

Pursuant to the remand order, the Appeals Council remanded the case to the ALJ for an additional hearing. (Tr. 97-100). In its remand order, the Appeals Council noted Plaintiff subsequently filed an application for SSI, which was approved as of February 20, 2014. (Tr. 99). The Appeals Council affirmed that determination, but remanded the decision to the ALJ to adjudicate the period prior to February 20, 2014. *Id.*

On April 14, 2015, the ALJ held a new hearing, at which Plaintiff (represented by counsel), and a vocational expert ("VE") testified. (Tr. 27-45). On May 11, 2015, the ALJ found Plaintiff not disabled in a written decision. (Tr. 7-23). The Appeals Council declined jurisdiction, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3). The Commissioner then filed a motion to reinstate the case (Doc. 16), which the district court granted (Doc. 17).

## FACTUAL BACKGROUND

### Personal Background

Plaintiff was born in March 1959, making him 51 years old on his alleged disability onset date. *See* Tr. 205. He had a high school education, and past work experience as a laborer. (Tr. 275).

<u>Relevant Medical Evidence</u>[1]

In August 2010, Plaintiff sought care after injuring his back while lifting boxes at work. (Tr. 404). The following month, he followed up with Billy Brown, M.D. (Tr. 399-401). On examination, Dr. Brown noted "mild pain to palpation in the LS spine midline" and a normal spine range of motion, but shuffling gate. (Tr. 400-01). He also noted muscular weakness in his left leg with mild left foot drop, unsteady gait, and a sensory deficit in Plaintiff's left leg with an absent left knee jerk. *Id.* He assessed lumbago and sciatica, and recommended bedrest, non-steroidal anti-inflammatory medication ("NSAIDs"), and a muscle relaxant. (Tr. 401). He ordered an MRI. (Tr. 401).

The MRI revealed lower lumbar spondylosis with canal, lateral recess, and foraminal stenosis. (Tr. 382). Specifically, it showed mild disk bulging at L3-L4 and L4-L5; mild L3-L4 and moderate L4-L5 canal stenosis; mild lateral recess stenosis at L3-L4 and moderate to severe at L4-L5; and mild annular bulging and moderate facet hypertrophic change at L5-S1. *Id.*

Later in September 2010, Plaintiff saw Bridget C. Mansell, PA-C, to follow up on his back pain. (Tr. 393-96). Plaintiff reported back pain, and numbness and tingling in his left foot. (Tr. 393). He reported relief from "sitting to the right" and having his left knee bent. *Id.* He also reported being unable to fill the prescriptions from Dr. Brown due to financial reasons. *Id.* On examination Ms. Mansell noted normal gait, and normal muscle strength except decreased strength (4/5) with plantar flexion, dorsiflexion, hip flexion, leg extension and flexion. (Tr. 395). Plaintiff had a positive straight leg raising test "at 30 with dorsiflexion" on the left side. *Id.* Ms. Mansell

---

1. Plaintiff was also treated for other ailments during the relevant time period, including hypertension. However, his arguments focus on the ALJ's determination regarding his back impairment, so the undersigned summarizes the evidence related to that impairment. *See, e.g., Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (arguments not raised in opening brief considered waived).

assessed lumbar spinal stenosis and lumbago with sciatica; her plan ("[p]er Dr. Tobias") was to consult physical therapy and pain management. (Tr. 396). Samuel Tobias, M.D., oversaw Ms. Mansell and noted Plaintiff did not want surgery at this time, but instead wanted to try conservative treatment. *Id.*

In November 2010, Plaintiff saw Fatima Ahmad, M.D., for pain management, reporting lower back pain radiating to his left leg for three months. (Tr. 380-82). On examination, Dr. Ahmad noted decreased spine range of motion, mild pain to palpation over the lumbar spine, but intact muscular strength, reflexes, and sensation. (Tr. 381). Plaintiff walked with a limp. *Id.* Dr. Ahmad prescribed NSAIDs and a muscle relaxant. (Tr. 382).

In December 2010, Plaintiff saw Howard R. Smith, M.D., for pain management. (Tr. 378-80). On examination, Dr. Smith noted Plaintiff had diffuse tenderness of the lumbar spine and paraspinous muscle areas, and an antalgic gait. (Tr. 379). He also had limited range of motion in flexion, extension, rotation, and lateral bending. *Id.* Dr. Smith observed a negative straight leg raising test, and Plaintiff was able to heel-toe walk. *Id.* Dr. Smith assessed sciatica, low back pain, carpal tunnel syndrome, and left leg pain. (Tr. 380). He was "given instructions [regarding] use of medications as ordered, intermittent rest, [and a] back care exercise program." *Id.* He was noted to be "stable" with respect to his low back pain, left leg pain, and carpal tunnel syndrome. *Id.*

The same month, Plaintiff returned to Dr. Brown, reporting, *inter alia*, continued low back pain. (Tr. 374-76). On examination, Dr. Brown noted Plaintiff had mild pain to palpation "in the LS spine midline", and "left leg weakness and sensory loss, drags left leg walking." (Tr. 375-76). He assessed lumbago and left-sided sciatica, noting symptoms were "consistent with herniated disc". (Tr. 376). He prescribed NSAIDs and a muscle relaxant, and advised bedrest and heat. *Id.*

Also in December 2010, Plaintiff twice saw Samuel Tobias, M.D., for removal of a scalp lipoma. (Tr. 369-74). Each time, Dr. Tobias noted normal gait, no sensory disturbance, and normal motor functioning. (Tr. 370, 372). At a return visit to Dr. Tobias in January 2011, Plaintiff was "[s]till . . . complaining of low back pain". (Tr. 367). Dr. Tobias again noted no motor, sensory, or strength deficit. *Id.* Plaintiff told Dr. Tobias he "wants mainly conservative treatment and will continue with pain management" regarding his back pain. *Id.*

In November 2011, Plaintiff underwent a neurological evaluation with Aamir Hussain, M.D. (Tr. 441-48). Plaintiff reported headaches since his lipoma removal, carpal tunnel syndrome, and left leg pain. (Tr. 441-42). He reported pain in his left leg for the prior three years, along with numbness in the leg. (Tr. 442). The leg dragged as he walked, he said, causing him to trip and fall as a result. *Id.* Plaintiff reported he walked up to one and a half blocks, and had used a cane for one year. *Id.* On examination, Dr. Hussain noted Plaintiff's spine range of motion was normal and muscular strength was intact. (Tr. 443). He also noted Plaintiff had an antalgic gait with pain in the left leg, but his heel to toe gait was normal. (Tr. 445). Dr. Hussain's plan was an "NCS/EMG study for possible lumbar radiculopathy". (Tr. 447). He noted he might consider epidural blocks depending on the EMG results. *Id.* He also recommended physical therapy and aqua therapy, and prescribed gabapentin for neuropathic pain. (Tr. 448).

Plaintiff began physical therapy in December 2011. (Tr. 451). He reported left leg pain "described as numbness with a tingling feeling", that was "intermittent." *Id.* The therapist noted tenderness at L1, but found Plaintiff's trunk flexion, extension, rotation, and side-bending were within normal limits. (Tr. 452). Strength was within normal limits, and Plaintiff could stand on one leg without losing balance, and stand on his toes for one minute. *Id.* In the assessment, the therapist noted Plaintiff "demonstrate[ed] some inconsistencies during assessment", that he had

good strength, mobility, and range of motion, and his "leg pain covering all surfaces is not typical of sciatic nerve distribution" making the etiology of his pain "[u]nclear." (Tr. 453).

Plaintiff also returned to Dr. Brown in December 2011. (Tr. 455-57). On examination Dr. Brown noted mild pain to palpation over the lumbar spine, bilateral shoulder and knee pain, as well as shuffling gait, and abnormal muscle tone and weakness in Plaintiff's left leg. (Tr. 456-57).

Plaintiff had six more physical therapy visits in December 2011. (Tr. 460-75). He reported pain varying from 4/10 to 7.5/10. *See id.* The therapist frequently noted "no change" in post-treatment pain and symptoms. *See* Tr. 460, 463, 465, 467, 468, 471. She also noted, however, that he once walked to therapy (causing his pain to be higher) (Tr. 460), and once rode his bicycle to an appointment (Tr. 474). He varyingly reported "less pain after treatment session" (Tr. 471), and "no[t] feeling better at this time" (Tr. 474). The therapist once noted an antalgic gait after therapy. (Tr. 465).

Physical therapy continued through January 2012. (Tr. 477-92). The therapist noted antalgic gait on multiple occasions. *See* Tr. 477 ("antalgic gait right noted"), 480 ("antalgic gait right noted, at times"); 482 ("antalgic gait right noted as he walked into therapy today"); 485 ("mild antalgic gait right noted as he walked into therapy today"); 488 (same); 492 ("mild antalgic gait noted after therapy"). At his last visit, Plaintiff was discharged "due to lack of consistent progress". (Tr. 493). The therapist noted his strength was good, his range of motion was within functional limits, and there were no real changes in his pain; she recommended he see a specialist for his back pain. (Tr. 492).

Plaintiff returned to Dr. Brown in March 2012. (Tr. 538-40). On examination, Dr. Brown noted mild pain to palpation in Plaintiff's lumbar spine, but normal spine range of motion and muscular strength. (Tr. 540). He also noted sensory loss in Plaintiff's left leg, and an absent left

knee jerk. *Id.* He continued to assess left sided sciatica and lumbago ("consistent with herniated disc"). *Id.*

Two days later, Plaintiff saw Dr. Hussain reporting headaches and chronic low back pain. (Tr. 534). He reported physical therapy caused him pain and was "going to start aqua therapy as advised." *Id.* On examination, Dr. Hussain noted normal muscle strength except in the left hamstring and left plantar flexion ("4+/5"), and normal muscle tone. (Tr. 535). His left knee was "areflexic" and had "no Babinski". *Id.* He had a mild decrease in sensation in his left leg. *Id.* Plaintiff's gait was "normal-based and antalgic". *Id.* Dr. Hussain's plan was an "NCS/EMG study for left lumbar radiculopathy". *Id.*

Plaintiff underwent the EMG study later in March 2012. (Tr. 537-38). It showed a "[d]ecrease in left tibial motor nerve amplitude . . . most likely related to a technical error or body habitus"; a "[n]ormal H reflex on the left"; "[f]ew chronic axon loss changes in the left extensor digitorum brevis muscle which may be related focal foot injury"; and "[c]hronic axon loss changes in two muscles around the left knee" which were "patchy in distribution and insufficient for definite diagnosis of lumbosacral motor." *Id.* Dr. Hussain noted: "No EMG evidence of a generalized sensorimotor polyneuropathy affecting the left leg." *Id.*

In October 2012, Plaintiff saw Travis Nickels, M.D., for pain management. (Tr. 746-51). Plaintiff reported left leg and left arm pain. (Tr. 746). He reported symptoms in his left leg worsened since it started two years prior. *Id.* On examination, Dr. Nickels noted decreased strength in Plaintiff's left leg and that he favored his left leg in the flexed position. (Tr. 750). No tone abnormalities or atrophy was noted. *Id.* Plaintiff had a positive straight leg raising test in the sitting and supine position, as well as pain to palpation over his cervical spine, lumbar spine, and paraspinous muscles. *Id.* He also had pain with facet loading and back extension/rotation. *Id.* Dr.

Nickels noted Plaintiff had diminished sensation along the C5-6 dermatomes and an antalgic gait. *Id.* His neurologic examination was normal. *Id.* Dr. Nickels observed Plaintiff's pain was "most consistent with radicular pain" and that he "would likely benefit from interventional injections, but the patient deferred at this time." (Tr. 751). Dr. Nickels prescribed medication, ordered a cervical spine x-ray due to new right arm symptoms, and noted Plaintiff was "not interested in interventional procedures at this time". *Id.*

In January 2013, Plaintiff saw Augusto T. Hsia, M.D. (Tr. 762-66). On examination, Dr. Hsia noted Plaintiff had decreased lumbar range of motion, walked with a limp, and his toe and heel walking was "decreased". (Tr. 765-66). Plaintiff had tenderness in his lumbar paraspinal muscles and decreased sensation. (Tr. 766). His reflexes and strength were normal, and his straight leg raising test was negative. *Id.* Dr. Hsia noted he would order a lumbar MRI to rule out "any significant disc pathology, stenosis". *Id.* That MRI revealed: "Progression of lumbar degenerative changes since 9/16/2010 now resulting in moderate L3-L4 and severe L4-L5 central canal stenosis with moderate-severe foraminal stenosis" (Tr. 770).

At a return visit to Dr. Hsia in May 2013, Plaintiff reported worsening leg and back pain. (Tr. 772). On examination, Dr. Hsia noted decreased lumbar and cervical spine range of motion, as well as decreased reflexes in Plaintiff's knees and ankles. (Tr. 773-74). His lower extremity strength was within normal limits and his straight leg raise test was negative. (Tr. 774). Dr. Hsia referred Plaintiff back to pain management for epidural steroid injections. *Id.*

Plaintiff returned to pain management a few days later and saw Maged Guirguis, M.D. (Tr. 779). On examination, Dr. Guirguis noted normal strength, and tone, and gait; he found no loss of sensation in Plaintiff's lower extremities. (Tr. 782). He had pain with facet loading and back extension/rotation. *Id.* His straight leg raising test was positive both sitting and supine. *Id.* Dr.

Guirguis noted Plaintiff "would likely benefit from interventional injections or surgical interventions, but the patient deferred at this time and wanted to continue with medical management." *Id.*

In July 2013, Plaintiff returned to Dr. Brown. (Tr. 791-93). On examination, Dr. Brown noted mild pain to palpation in the lumbar spine, but normal spine range of motion, and normal muscular strength. (Tr. 792-93). He also observed Plaintiff had sensory loss in his left leg, and an absent left knee jerk. (Tr. 793).

Plaintiff returned to Dr. Brown in September 2013. (Tr. 796-98). Dr. Brown observed neck pain on motion, and mild pain to palpation in the lumbar spine. (Tr. 797). Plaintiff's spine range of motion was again normal, and his muscular strength intact. (Tr. 798). His neurological examination revealed several positive findings: shuffling gait, abnormal muscle tone ("WASTING"), muscular weakness in the left lower leg, and a sensory deficit in the left leg. *Id.*

Plaintiff saw Dr. Brown twice more in 2013 (November and December). (Tr. 808-10; 813-15). Each visit, Dr. Brown noted mild pain to palpation in the lumbar spine, a shuffling gait, and left leg weakness. (Tr. 809-10, 814-15). He also noted "abnormality of coordination UNSTEADY" and "sensory deficit LEFT LEG" in November (Tr. 810); and "abnormal muscle tone SPATIC [sic] LEFT LEG" in December (Tr. 815). Dr. Brown's treatment plan each visit was bedrest, medication, and warm moist heat. (Tr. 810, 815).

Plaintiff returned for neurological follow up in January 2014 and saw Dulara Hussain, M.D. (Tr. 818-19). Plaintiff reported he was "still having pain in his back and left leg", but it did not "bother [him] like before". (Tr. 818). Dr. Hussain noted he "saw spine medicine and pain management" and his "current pain medications help[] him". *Id.* On examination, Dr. Hussain noted Plaintiff's muscle strength was normal, with no drift, and normal tone. (Tr. 819). His reflexes

were also normal, and his sensation "intact". *Id.* His gate was noted to be "normal-based". *Id.* Dr. Hussain noted Plaintiff's main complaint was chest pain on his right side and down his right arm. *Id.* He also noted "[b]ack pain is better" and that he "doubt[ed] this [was] neurological." *Id.*

In March 2014, Plaintiff returned to Dr. Brown who again observed mild pain to palpation in the lumbar spine, shuffling gait, a dragging left leg, and a left leg sensory deficit. (Tr. 825). At a June 2014 visit, Dr. Brown observed mild pain to palpation in the lumbar spine, bilateral shoulder and knee pain, as well as left hip pain. (Tr. 831-32). However, he also noted a normal gait, normal reflexes and that Plaintiff's sensation was "grossly intact." *Id.*

In July 2014, Plaintiff saw rheumatologist Howard Smith, M.D. to evaluate his chronic lower back pain (Tr. 839-45). Dr. Smith noted Plaintiff was not interested in injections, referral to pain management, or surgery and stated he would "treat this conservatively with physical therapy." (Tt. 839). On examination Dr. Smith noted diffuse tenderness of the lumbar spine and paraspinous muscle areas, "but was otherwise normal for palpation and percussion". (Tr. 841). Plaintiff had an antalgic gait and was "unable to stand on heels and toes." *Id.* His seated straight leg raising test was "equivocal bilaterally". *Id.* His range of motion was markedly limited in flexion, extension, rotation, and lateral bending. *Id.* His motor strength and sensation were normal. *Id.*

*Opinion Evidence*

In August 2011, state agency physician Mila Bacalla, M.D., reviewed Plaintiff's records. (Tr. 52-53). Dr. Bacalla opined Plaintiff could perform light work, with occasional climbing of ladders, ropes, and scaffolds, as well as occasional stooping and crouching. *Id.*

In January 2012, Eulogio Sioson, M.D., conducted a consultative examination of Plaintiff at the request of the state agency. (Tr. 431-35). On examination, Dr. Sioson noted Plaintiff "walked normally with no assistive device", and was able to "get up and down the examination table." (Tr.

431). Plaintiff declined to do heel toe walking and to squat "with back pains." *Id.* Plaintiff had "marked lower back tenderness"; his straight leg raising sitting was negative, but "lying with back pain 30 degrees bilaterally." (Tr. 432). Plaintiff had no muscle atrophy, but had "numbness in his whole left upper and lower extremities." *Id.* Dr. Sioson opined: "if one considers limitation of range of motion from pain and above findings, work-related activities would be limited to light work." *Id.*

On April 4, 2012, state agency physician Maria Congbalay, M.D., reviewed Plaintiff's records. (Tr. 64-65). She concluded Plaintiff could perform light work, with occasional climbing of ladders, ropes, and scaffolds; occasional stooping and crouching; and frequent kneeling and crawling. *Id.*

<u>Hearing Testimony</u>

At the hearing, Plaintiff testified his back pain worsened in 2012. (Tr. 32). He stated his "leg started dragging", and he "would almost trip and fall", making it difficult for him to walk any distance. *Id.* Plaintiff had a cane with him at the hearing, which he testified was issued to him "about a month ago". (Tr. 33). He was prescribed the cane because he started a medication that affected his balance. *Id.* Plaintiff had previously used a cane "off and on", but had just recently received the prescription. *Id.* Plaintiff previously told his doctor he was using a cane and the doctor sent him to therapy, which "was making it worse" and he could hardly walk when he left the therapy sessions. (Tr. 33-34). Plaintiff testified he attended physical therapy for three to four months, but it did not help. *Id.*

Plaintiff testified a recent medication change for his blood pressure caused dizziness. (Tr. 35, 36-37). His medication did not help with his leg dragging. *Id.* Plaintiff estimated that in 2010-2012, he could not walk "too far before [his] legs started dragging, maybe about a block or so".

(Tr. 35-36). After a block, his "muscles w[ere] tired" and his hip started to hurt. (Tr. 36). He said his physician told him his hip pain was caused by his back pain. *Id.* Plaintiff also estimated he could stand in one place for ten to fifteen minutes, and that sitting was less comfortable. (Tr. 38-39).

Plaintiff testified he discussed surgery with a doctor, but declined because his primary physician told him there was only a fifty percent chance of success. (Tr. 37-38). He also testified that his medication did "not really" help his pain. (Tr. 38). During a normal day in the relevant time period, Plaintiff "would be propped up on pillows or leaning forward trying to keep [his] leg elevated" to take pressure off his spine. (Tr. 39).

VE Testimony

When asked to consider an individual with Plaintiff's age, education, work history, and RFC (as ultimately determined by the ALJ) could perform work, the VE responded that such a person could perform jobs such as housekeeping cleaner, sales attendant, and mail clerk. (Tr. 41).

Plaintiff's counsel asked the VE to consider an individual who could stand and walk for no more than two hours in an eight-hour workday, and could only occasionally lift up to ten pounds. (Tr. 42). The VE testified such a person would be limited to sedentary work. *Id.* Further, the VE testified that if an individual in a "light work" job required two additional breaks for longer than ten minutes, it would require employer accommodation or exclude all work. (Tr. 42-43).

ALJ Decision

In her May 11, 2015 written decision, the ALJ found Plaintiff had not engaged in substantial gainful activity since his application date. (Tr. 12). She found Plaintiff had severe impairments of degenerative disc disease of the lumbar spine and arthropathies. *Id.* She concluded

that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment, specifically noting:

> The claimant's physical impairments do not meet or equal Sections 1.02 or 1.04. Contrary to his testimony, the medical evidence indicates that the claimant remains able to ambulate effectively. He is able to use both upper extremities to handle, grasp and manipulate objects.

(Tr. 13).[2] The ALJ then concluded Plaintiff retained the residual functional capacity to:

> Perform light work as defined in 20 CFR 416.967(b) except lift, carry, push and pull 10 pounds frequently and 20 pounds occasionally; climb ramps/stairs frequently. Climb ladders/ropes/scaffolds occasionally; stoop/crouch occasionally; and kneel/crawl frequently.

*Id.* The ALJ then found Plaintiff had no past relevant work, had a high school education, and was able to communicate in English. (Tr. 17). She noted Plaintiff was born in March 1959 and was 51 years old—an individual "closely approaching advanced age"—on the date of his application. *Id.* Based on the testimony of the VE, the ALJ concluded there were significant numbers of jobs in the national economy that Plaintiff could perform. *Id.* Therefore, the ALJ concluded Plaintiff was not disabled from December 15, 2010, through February 19, 2014. (Tr. 18).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health &*

---

2. Later in her opinion, the ALJ expressly addressed counsel's argument that Plaintiff met Listing 1.04A and explained why she disagreed. (Tr. 16-17). This is discussed in greater detail below in relation to Plaintiff's listing argument.

*Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to

establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff argues the ALJ erred: 1) in her residual functional capacity assessment; and 2) in failing to find his impairments meet the requirements of Listing 1.04. (Doc. 23, at 9-16). The Commissioner responds that substantial evidence supported the ALJ's RFC determination, and the ALJ's determination at Step Three was reasonable and supported by the evidence. (Doc. 25, at 11-17). The undersigned addresses Plaintiff's arguments in reverse order, and for the reasons discussed below, the undersigned affirms the decision of the Commissioner.

Listing 1.04A

Plaintiff contends the ALJ "failed to conduct a proper evaluation of whether [he] meets the requirements of Listing 1.04." (Doc. 23, at 14). The Commissioner responds that Plaintiff failed to show his back impairment met the listing. (Doc. 25, at 15-17). For the reasons discussed below, the undersigned finds the ALJ did not err in her consideration of Listing 1.04A.

A claimant's impairment must meet every element of a listing before the Commissioner may conclude that he is disabled at Step Three of the sequential evaluation process. *See* 20 C.F.R. § 404.1520; *Duncan v. Sec'y of Health & Human Servs.,* 801 F.2d 847, 855 (6th Cir. 1986). The claimant has the burden to prove all the elements are satisfied. *King v. Sec'y of Health & Human Servs.,* 742 F.2d 968, 974 (6th Cir. 1984). Moreover, "[t]he burden of providing a . . . record . .

complete and detailed enough to enable the Secretary to make a disability determination rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.,* 803 F.2d 211, 214 (6th Cir. 1986). It is not sufficient to come close to meeting the conditions of a listing. *See, e.g., Dorton v. Heckler,* 789 F.2d 363, 367 (6th Cir. 1989) (Commissioner's decision affirmed where medical evidence "almost establishes a disability" under a listing).

Listing 1.04A provides:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 1.04.

At Step Three in her written decision, the ALJ found Plaintiff did not meet any listed impairment, explaining:

The claimant's physical impairments do not meet or equal Sections 1.02 or 1.04. Contrary to his testimony, the medical evidence indicates that the claimant remains able to ambulate effectively. He is able to use both upper extremities to handle, grasp and manipulate objects.

(Tr. 13).[3] She also specifically addressed counsel's argument at the hearing regarding Listing 1.04A:

---

3. Although the parties do not present arguments regarding the ability to ambulate effectively, the ALJ's decision seems to have (at least partially) relied upon this determination. The ALJ's initial statement regarding the listings, explaining that "the medical evidence indicates that the claimant remains able to ambulate effectively" and he is "able to use both upper extremities to handle, grasp and manipulate objects", appears to refer to Listing 1.00 (Musculoskeletal System), which states that "functional loss for purposes of these listings is defined as the inability to ambulate effectively on a sustained basis". It later defines "inability to ambulate effectively" as:

In closing remarks, counsel stated the claimant's impairments meet Section 1.04A. The claimant had a second MRI in 2013 that showed objective worsening over the MRI performed in 2010; consistent with the claimant's subjective increase of complaints of pain. At an examination on September 3, 2013 with [his] primary care physician, it was noted the claimant had abnormal muscle tone wasting, muscular weakness in the left lower leg, and sensory deficit in the left leg (Ex. 18F., pp. 3, 8).

The claimant was examined on March 4, 2014 and it was noted that the claimant "drags left leg" (Ex. 18F, p. 35). However, on January 5, 2014[, an] examination showed normal strength in upper extremities and lower extremities with normal-based gait. The claimant denied new gait difficulty, arm or leg weakness, and numbness or tingling. His left lower extremity pain had resolved. Of note, an EMG of left upper and lower extremities was negative for neuropathy. A lumbar MRI in 2010 was significant for lumbar spondylosis and facet hypertrophy (Ex. 18F, p. 28). The claimant had ongoing treatment with pain management.

The undersigned also notes that the claimant was examined by a neurologist on January 2, 2014. The physical examination was essentially within normal limits and he had a normal gait. It was noted that, with every visit he had new symptoms and an old symptom would resolve. The claimant had numerous diagnostic tests that were essentially normal. The neurologist doubted any radiculopathy because of the intermittent symptoms and position of pain (Ex. 18F, p. 29).

---

an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. § Pt. 404, Subpt. P, App'x 1, § 1.00B2b. It further explains that examples of ineffective ambulation include: "the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces", among other things. *Id.*

Thus, the ALJ's initial determination regarding Listing 1.04 appears to rest on the assumption that Listing 1.04 includes the preliminary requirements in Listing 1.00. Courts have disagreed about whether the "inability to ambulate effectively" requirement in Listing 1.00 applies to Listing 1.04A. *Compare, e.g., Isaacs v. Berryhill*, 2017 WL 1190382, at *3-4 (W.D. Ky.) (finding inability to ambulate not a criteria necessary to satisfy 1.04A) *with Miller v. Colvin*, 2014 WL 2208119, at *3 (W.D.N.C.) (finding inability to ambulate a necessary criteria to satisfy 1.04A).

Regardless, the ALJ explicitly addressed Listing 1.04A later in her analysis and provided other (substantially supported) reasons for finding Plaintiff did not meet the listing.

> Consequently, counsel's assertion that the claimant's musculoskeletal impairments meets Section 1.04A is not supported by the evidence.

(Tr. 16-17).

Although there is evidence to support Plaintiff's contention, the undersigned must affirm if there is substantial evidence to support the ALJ's decision. *See Jones*, 336 F.3d at 477. Further, this is not a case where the ALJ ignored contrary evidence, rather, she acknowledged it. *See* Tr. 16 (citing evidence of muscle tone wasting, weakness, sensory deficit, and "drag[ging] [of] left leg."). Nor is this a case where Plaintiff presented evidence that he might meet a listing and the ALJ failed to evaluate the listing. *See Smith-Johnson v. Comm'r of Soc. Sec.*, 544 F. App'x 426, 432-33 (6th Cir. 2014) (if record evidence raises a "substantial question" about whether a claimant meets a listing, ALJ must explicitly address the listing). Although there was sufficient evidence to raise the question of whether Plaintiff met the listing, the ALJ addressed the question, and her finding that he did not is supported by substantial evidence.

The parties dispute, in essence, whether the element of "nerve root compression" in Listing 1.04A is met. Nerve root compression for purposes of the listing has four requirements:

1. neuro-anatomic distribution of pain;
2. limitation of motion of the spine;
3. motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss;
   ***and***, if there is involvement of the lower back;
4. positive straight-leg raising test (sitting and supine).

Listing 1.04A (emphasis added). The ALJ first cited records noting elements relevant to the listing: muscle tone wasting, weakness, and sensory loss in the left leg (Tr. 16) (citing Tr. 798) (September 2013); "drags left leg" (Tr. 16) (citing Tr. 825) (March 2014). In contrast, however, the ALJ then pointed to: 1) a January 2014 appointment in which Plaintiff denied new gait difficulty, arm or leg weakness, numbness, or tingling, and at which an examination revealed Plaintiff had normal

strength and a "normal-based" gait, *see* Tr. 818-19; and 2) an EMG which was negative for neuropathy, *see* Tr. 536-38. (Tr. 16).

The cited records provide support for the ALJ's conclusion. Plaintiff emphasizes that the January 2014 record provides Plaintiff "denied any *new* gait difficulty" (Tr. 818) (emphasis added), noting this "suggest[s] an existence of prior gait difficulties." (Doc. 23, at 15). However, in that same treatment note, Dr. Hussain specifically provides that Plaintiff's gait was "normal-based". (Tr. 819). Additionally, at that same visit, Plaintiff reported he was "still having pain in his back and left leg", but it did not "bother [him] like before", leading Dr. Hussain to note that Plaintiff's back pain was "better". (Tr. 818-19). Moreover, as the ALJ pointed out, neurologist Dr. Hussain doubted Plaintiff's problem was neurological, and doubted thoracic radiculopathy "due to intermittent symptoms/positional pain." (Tr. 819). Further, the ALJ pointed to Plaintiff's EMG results. *See* Tr. 16 (citing Tr. 537-38). Those results showed "[n]o EMG evidence of a generalized sensorimotor polyneuropathy affecting the left leg", and noted "[c]hronic axon loss changes in two muscles around the left knee . . . patchy in distribution and insufficient for the definite diagnosis of lumbosacral motor." (Tr. 537). Later, Dr. Dulara Hussain noted that the "EMG of LUE and LLE negative for neuropathy". (Tr. 818). Thus, these cited records, among other substantial evidence in the record, provide support for the ALJ's determination that Plaintiff did not meet the listing's requirement of nerve root compression causing related symptoms.

There was evidence that Plaintiff exhibited signs of each element of Listing 1.04A at times. However, he did not do so consistently, and there was significant conflicting evidence as well.

Records indicated a limited range of motion in Plaintiff's spine as required by the listing. *See* Tr. 381 (November 2010); Tr. 379 (December 2010); Tr. 765 (January 2013); Tr. 773 (May 2013); (Tr. 841) (July 2014). However, there was contradictory evidence in the record—covering

the same time period—in which Plaintiff's spinal range of motion was noted to be normal. *See* Tr. 401 (August 2010); Tr. 443 (November 2011); Tr. 452 (December 2011); Tr. 492 (January 2012 "within functional limits"); (Tr. 540) (March 2012); Tr. 793 (September 2013).

Records also indicated some motor loss, which was sometimes accompanied by sensory or reflex loss. *See* Tr. 401 (August 2010 – muscular weakness with sensory deficit); Tr. 376 (December 2010 - (left leg weakness and sensory loss); Tr. 457 (December 2011 – abnormal muscle tone and weakness); Tr. 540 (March 2012 – sensory loss, but normal strength); Tr. 535 (March 2012 – mild decrease in sensation, but normal muscle tone); Tr. 750 (October 2012 – decreased strength, but no tone abnormality or atrophy); Tr. 766 (January 2013 decreased sensation); Tr. 773-74 (May 2013 – decreased knee and ankle reflexes, but normal lower extremity strength); Tr. 792-93 (July 2013 – sensory loss, but normal muscular strength); Tr. 798 (September 2013 – abnormal muscle tone, muscular weakness, and sensory deficit); Tr. 810 (November 2013 – weakness and sensory deficit); Tr. 815 (December 2013 - weakness and abnormal muscle tone). But there were also significant records to the contrary. *See* Tr. 381 (November 2010 – muscular strength intact, with normal reflexes and sensation); Tr. 370, 372 (December 2010 – no sensory disturbance, normal motor functioning); Tr. 367 (January 2011 – no motor, sensory, or strength deficits); Tr. 443 (November 2011 - muscular strength intact); Tr. 766 (January 2013 – normal reflexes and strength); Tr. 774 (May 2013 – normal strength, tone, and no loss of sensation); Tr. 819 (January 2014 – normal muscle strength, tone, reflexes, and sensation); Tr. 831-32 (March 2014 – normal reflexes and sensation "[g]rossly intact"); Tr. 841 (July 2014 – normal motor strength and sensation).

Additionally, there are several positive straight leg raising tests in the record. *See* Tr. 395 (September 2010); Tr. 750 (October 2012); Tr. 782 (May 2013). However, there was also

significant conflicting evidence of negative straight leg raising tests in the record. *See* Tr. 379 (December 2010); Tr. 432 (January 2012); Tr. 766 (January 2013); Tr. 774 (May 2013). The most recent straight leg raising test in the record was noted to be "equivocal bilaterally". (Tr. 841) (July 2014).

Although Plaintiff can point to evidence in the record to suggest a contrary conclusion, there is also substantial evidence in the record to support the ALJ's conclusion that Plaintiff condition did not meet all the requirements of Listing 1.04A. As such, the undersigned must affirm. *See Jones*, 336 F.3d at 477.

RFC Determination

Plaintiff also contends the ALJ's RFC determination "is not supported by the objective evidence of record." (Doc. 23, at 9). Specifically, Plaintiff objects to the ALJ's decision to rely heavily upon (and assign "great weight" to) the opinions of Drs. Sioson and Congbalay because those physicians authored their opinions without the benefit of much of the record. *See id.* at 9-13. Plaintiff argues the ALJ "exceeded her role by exercising medical expertise she did not have in interpreting raw medical data to determine Plaintiff's residual functional capacity and by determining disability on an incomplete record which contained no medical residual functional capacity assessments after February 2012." *Id.* at 12. The Commissioner responds that it was not error for the ALJ to rely on these medical opinions, but rather the ALJ reasonably determined these opinions remained consistent with the record as a whole. (Doc. 25, at 11-15). For the reasons discussed below, the undersigned finds no error in the ALJ's decision.

The RFC is the most a claimant can do despite the limitations from his physical and mental impairments. 20 C.F.R. § 416.945(a). The assessment must be based upon all of the relevant evidence, including the medical records, medical source opinions, and the individual's subjective

allegations and description of his own limitations. 20 C.F.R. § 416.945(a). The final responsibility

for determining a claimant's RFC is reserved to the Commissioner. 20 C.F.R. § 416.927(d).

Dr. Sioson authored his opinion after examining Plaintiff in January 2012. *See* Tr. 431-32.

Dr. Congbalay's opinion was based on her April 2012 review of Plaintiff's records. *See* Tr. 64-

65). The ALJ explained:

> As for the opinion evidence, the undersigned gives great weight to Dr. Sioson's
> opinion that the claimant could perform light work as the opinion is wholly
> consistent with the medical evidence of record. The claimant maintains normal
> muscle strength and tone. Although the claimant complains of additional
> limitations these statements are not supported by the objective evidence of record.
> Likewise, the undersigned gives great weight to the State agency medical
> consultant's opinion that the claimant can perform light work, which is based on
> the medical evidence and Dr. Sioson's opinion.

(Tr. 16). On the prior page, the ALJ summarized Plaintiff's treatment records from October 2012

through January 2014. (Tr. 15).

First, as to Plaintiff's objection regarding the opinion testimony, an ALJ may rely on

medical opinions from physicians who have not reviewed the entire record so long as the ALJ

considers the post-dated evidence in formulating her opinion. *See, e.g., McGrew v. Comm'r of Soc.

Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (indicating that an ALJ's reliance upon state agency

reviewing physicians' opinions that were outdated was not error where the ALJ considered the

evidence developed post-dating those opinions; *Patterson v. Comm'r of Soc. Sec.*, 2017 WL

914272 at *10 (N.D. Ohio); *Ruby v. Colvin*, 2015 WL 1000672, at *4 (S.D. Ohio) ("[S]o long as

an ALJ considers additional evidence occurring after a state agency physician's opinion, he has

not abused his discretion."). Thus, it is not per se error for the ALJ to rely on such opinions. Here,

the ALJ acknowledged and reviewed the treatment record post-dating these opinions. *See* Tr. 15-

16. The ALJ specifically noted the MRI Plaintiff now points to as evidence of objective worsening

of his condition post-dating the state agency physician opinions. *See* Tr. 15 ("The treatment records

contain an MRI of the lumbar spine dated January 23, 2013 showing progression of lumbar degenerative changes since September 15, 2010 . . . ") (citing Tr. 770-71). And, as cited above, the determination of Plaintiff's RFC is reserved to the Commissioner. *See* 20 C.F.R. § 416.927(d).

Second, Plaintiff contends essentially that the ALJ "played doctor" by substituting her own opinion for that of a medical professional. *See* Doc. 23, at 12-13. In support, Plaintiff cites *Meece v. Barnhart*, 192 F. App'x 456, 464-65 (6th Cir. 2006). In *Meece*, the Sixth Circuit found an ALJ's decision to discount Plaintiff's pain complaints, and his treating physician's opinion was not legitimate because it was "beyond the expertise of the ALJ". *Id.* at 465 ("While the ALJ discounted the extent of Plaintiff's headache pain due to the fact that Plaintiff's doctors failed to prescribe Fiorinal, Imitrex, or Zomig, the ALJ may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence."). But *Meece*, and the other cases cited by Plaintiff, address primarily instances where an ALJ relied on his or her own raw interpretation of the medical records *contrary to the* opinion of a physician. *See, e.g.*, *Brown v. Comm'r of Soc. Sec.*, 2015 WL 1431521, at *4 (W.D. Mich.) ("It is well established that the ALJ may not substitute his medical judgment for that of the claimant's physicians."); *Mascaro v. Colvin*, 2016 WL 7383796, at *32 (ND. Ohio) ("Neither the ALJ nor this Court has the medical expertise to conclude whether a grossly intact neurological exam or an absence of 'erythema' necessarily rules out the disabling condition to which Dr. Smith opined."), *report and recommendation adopted by* 2016 WL 7368676. Here, by contrast, and as referenced by the ALJ:

> The updated medical records do not contain any opinions from treating or examining physicians indicating the claimant is disabled or even has limitations greater than those determined in this case.

(Tr. 16). That is, there was no opinion evidence in the record in place of which the ALJ supplanted her own opinion. Rather, she relied upon the earlier dated opinions of record, and found then consistent with the evidence submitted both pre-dating, and post-dating those opinions. *See* Tr. 16.

Plaintiff contends, however, the ALJ should have sought additional medical opinion evidence to evaluate the later-developed records, including the MRI. This argument fails because Plaintiff bears the burden of proving he is disabled. *See* 20 C.F.R. § 416.912(A); *Watters v. Comm'r of Soc. Sec.*, 530 F. App'x 419, 425 (6th Cir. 2013). And, "[a]n ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (quoting 20 C.F.R. §§ 404.1517, 416.917) (" 'If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we may ask you to have one or more physical or mental examinations or tests' "); *see also Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (ALJ authorized but not required to order additional testing "*if* the existing medical sources do not contain sufficient evidence to make a determination") (emphasis added).

Although Plaintiff contends there was "three new years of evidence with objective evidence of worsening impairment" (Doc. 23, at 13), the ALJ reasonably considered this evidence, *see* Tr. 15-16. While Plaintiff is correct that the January 2013 MRI showed "[p]rogression of lumbar degenerative changes since 9/16/2010" (Tr. 770), the ALJ acknowledged the MRI (Tr. 15); and the treatment records post-dating the opinion evidence, as cited by the ALJ, reflect conflicting results, much like the treatment results pre-dating such evidence, *see* Tr. 766, 774 (January & May 2013 – negative straight leg raising tests); Tr. 841 (July 2014 - "equivocal" straight leg raising test from July 2014); Tr. 766 (January 2013 – normal reflexes and strength); Tr. 774 (May 2013 –

normal strength, tone, and no loss of sensation); Tr. 819 (January 2014 – normal muscle strength, tone, reflexes, and sensation); Tr. 831-32 (March 2014 – normal reflexes and sensation "[g]rossly intact"); Tr. 841 (July 2014 – normal motor strength and sensation). Additional treatment records, from both before and after the opinion evidence, are set forth more fully above in the analysis of Plaintiff's listing argument. These show that while at times Plaintiff had strength, sensory, reflex, range of motion, or gait deficits—both before and after Dr. Sioson's and Dr. Congbalay's opinions—at other times he did not. *See generally discussion supra.*

Additionally, as the ALJ specifically pointed out, in some of Plaintiff's most recent treatment notes, he had a normal gait and his physical examination was essentially normal. *See* Tr. 16 (citing Tr. 818-19). At that January 2014 visit, Dr. Hussain noted Plaintiff was "still having pain in his back and left leg", but it did not "bother [him] like before". (Tr. 818). He noted Plaintiff had normal muscle strength, tone, reflexes, sensation, and gait. (Tr. 819).

Ultimately, the undersigned finds the ALJ's decision in this regard is supported by substantial evidence in the record. The treatment records after the opinion evidence were similar to the treatment records before the opinion evidence. That is, sometimes they showed gait difficulty, weakness, or numbness, and sometimes they did not. Because this is the case, the ALJ did not err in finding the earlier medical opinions "wholly consistent with the medical evidence of record." (Tr. 16). Further, Dr. Sioson's own examination in January 2012 revealed "marked lower back tenderness", a positive supine straight leg raising test, and "numbness in his whole left upper and lower extremities". (Tr. 432). Despite these limitations, Dr. Sioson opined Plaintiff could perform light work. *Id.* While the later MRI showed some progression of Plaintiff's back impairment, the ALJ had substantial evidence in the ongoing treatment record to conclude the opinion evidence was consistent with the record as a whole. Thus, the undersigned finds no error

in the ALJ's reliance on earlier opinion evidence. *See Dean v. Comm'r of Soc. Sec.*, 2015 WL 4078017, at *7 (S.D. Ohio) ("Last, the undersigned does not find persuasive Plaintiff's suggestion that the ALJ substituted her judgment and, in effect, played doctor, by referencing various medical records. To the contrary, the undersigned concludes that the ALJ did not stray from her appropriate role as the final arbiter of Plaintiff's RFC.").

It bears repeating that even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Here, the undersigned finds substantial evidence supports the ALJ's conclusion that the opinion evidence from Drs. Sioson and Congbalay was consistent with the record as a whole. As such, the ALJ did not err in determining Plaintiff's RFC.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI supported by substantial evidence and therefore affirms that decision.

 s/James R. Knepp II
United States Magistrate Judge